**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


AARON ROMERO,

       Plaintiff,

v.                                     CV 14-640 MV/WPL

UNITED STATES OF AMERICA,
JOHN R. CASTLEBERRY, Special Agent –
Drug Enforcement Administration, in his individual capacity,
PATRICIA G. WHELAN a.k.a. PATRICIA YAZZIE a.k.a. TRISH YAZZIE,
Special Agent – Drug Enforcement Administration, in her individual capacity,
MATTHEW B. MAYFIELD, Group Supervisor (GS) –
Drug Enforcement Administration, in his individual capacity,
RAYMOND "KEITH" BROWN, Assistant Special Agent in Charge (ASAC) –
Drug Enforcement Administration, in his individual capacity, and
JOSEPH M. ARABIT, Special Agent in Charge (SAC) –
Drug Enforcement Administration, in his individual capacity,

       Defendants.


**<u>MEMORANDUM OPINION AND ORDER</u>**

       THIS MATTER comes before the Court on Defendants Castleberry and Whelan's

Motion to Dismiss [Doc. 47], Defendant Matthew B. Mayfield's Rule 12(b)(6) Motion to

Dismiss [Doc. 49], Motion to Dismiss Claims Against Defendants Arabit and Brown on

Qualified Immunity Grounds [Doc. 80], and Defendants Arabit and Brown's Rule 12(b)(1)

Motion to Dismiss Substantive Due Process Claims Under Bivens [Doc. 100].   The Court,

having considered the motions, briefs, and relevant law, and being otherwise fully informed,

finds that Defendants Castleberry and Whelan's Motion to Dismiss, Defendant Matthew B.

Mayfield's Rule 12(b)(6) Motion to Dismiss, and Motion to Dismiss Claims Against Defendants

Arabit and Brown on Qualified Immunity Grounds, are well-taken and will be granted, and that

Defendants Arabit and Brown's Rule 12(b)(1) Motion to Dismiss Substantive Due Process

Claims Under Bivens will be denied as moot.

## BACKGROUND

The facts as alleged by Plaintiff in his First Amended Complaint [Doc. 23] are as follows.

Plaintiff, Aaron Romero, is a lifelong resident of Las Vegas, New Mexico.   After experimenting

with alcohol and marijuana since his early high school years, Plaintiff started using crack cocaine

the night before his high school graduation in May of 1994; for the next 17 years, his addiction

to crack dominated his life.   Doc. 23 (Compl.) ¶¶ 37, ¶ 39.   As a result of his daily drug use, in

1998, his girlfriend left him, taking their two children with her.   Id. ¶¶ 44-45.   Although

Plaintiff attended an inpatient drug treatment program in 1999, within one week of his discharge

from treatment, he resumed his daily use of crack.   Id. ¶¶ 48-49.

In 2007, Plaintiff moved in with his girlfriend, Theresa Saiz, a recovering crack addict.

Id. ¶¶ 51-52.   The two remained "clean" for a "long period of time" between 2007 and 2008,

but resumed their daily use of crack at some point in 2008.   Id. ¶¶ 52-53.   As a result, Plaintiff

lost his job at his family business, and was thereafter unable to maintain regular employment.

Id. ¶¶ 54-55.

In order to support his drug addiction, Plaintiff did, inter alia, "side jobs" for known drug

traffickers, in exchange for payment in the form of crack or cash; if he received cash, he would

immediately use it to purchase crack.   Id. ¶ 57.   In 2010, through a local drug trafficker,

Plaintiff met Cesario, who was a customer of the trafficker.   Id. ¶ 58.   Toward the end of 2010,

that trafficker left two grams of crack at Plaintiff's residence, and instructed Plaintiff not to use

it.   Id. ¶¶ 63-64.   Plaintiff, however, used the crack.   Id. ¶ 65.   After the incident and

because of Plaintiff's "severe addiction" to crack, the trafficker refused to provide or sell crack to Defendant.   Id. ¶ 70.

"[I]n an effort to establish a reliable process to obtain crack for his own use," Plaintiff suggested that Cesario stop purchasing crack from that drug trafficker, and instead purchase crack through Plaintiff from other local drug traffickers; as payment for Plaintiff's brokering of the drug transactions, Plaintiff suggested that Cesario provide him with a small amount of crack. Id. ¶¶ 71-72.   Cesario, "in reaction," agreed to Plaintiff's suggestion, and sometime in 2010 or 2011, began to use Plaintiff two or three times a week as a broker to purchase crack.   Id. ¶ 73. As payment for his brokering of the drug transactions, Cesario gave Plaintiff a "one or two day supply" of crack for his personal use.   Id. ¶ 74.   This "brokerage and consumption relationship" continued for six or seven months, until "mid-summer 2011."   Id. ¶ 75.

In mid-summer 2011, Cesario disappeared.   Id. ¶ 77.   Despite "frantically" attempting for several days to obtain crack, without Cesario, none of the local drug traffickers or users were willing to supply Plaintiff with crack.   Id. ¶¶ 78-80.   As a result of his inability to obtain crack, from mid-summer 2011 to mid-November 2011, Plaintiff did not use crack.   Id. ¶ 84.

"As the fog of addiction gradually receded over a period of several weeks during the summer of 2011," Plaintiff "began to focus slowly on the hope and belief of recovery" from his addiction, and "began to attempt to rehabilitate gradually his relationships with his parents, siblings, and children."   Id. ¶¶ 82-83.   He was "able to refrain from continued, desperate attempts to procure crack," and by mid-October 2011, "believed in his self-rehabilitation through the forced cessation of consumption of crack" and his "renewed effort to repair his mental and physical health – enhanced by the inspiration of reconciliation of his personal relationships." Id. ¶¶ 84-85.

Mending his family ties "was a more difficult undertaking than [he] had imagined."   Id. ¶ 87.   By mid-November 2011, "the high degree of distrust exhibited by [Plaintiff's] family members (regarding the potential relapse of addiction to [crack]) receded slightly, and the persistent craving for [crack] moderated to a tolerable level."   Id. ¶ 88.   Plaintiff "was struggling to meet the demands of everyday life, together with the grueling but increasingly successful effort to heal the relationship with his children and other family members."   Id. ¶ 90.

In October 2011, Cesario reappeared in Las Vegas.   Unbeknownst to Plaintiff, the DEA had brought Cesario back to Las Vegas to work as a confidential informant in connection with "Operation Smack City," an Organized Crime Drug Enforcement Task Force ("OCDETF") and High Intensity Drug Trafficking Area ("HIDTA") investigation of drug traffickers in Las Vegas, New Mexico.   Id. ¶¶ 90-92.   Defendants Castleberry and Whelan were the primary case agents on the investigation.   Id. ¶ 99.   Defendant Mayfield supervised Castleberry and Whelan, Defendant Brown supervised Mayfield, and Defendant Arabit supervised Brown.   Id. ¶¶ 105-118.

Upon his return to Las Vegas, Cesario, in his role as a DEA confidential informant, contacted Plaintiff, and asked Plaintiff to "restart" the crack "brokerage and consumption relationship," noting that he would "start coming in for bigger amounts because he had sold a trailer." Id. ¶ 125.   Initially, Plaintiff rejected Cesario's invitation, and told Cesario that he "was clean and intended to remain clean."   Id. ¶ 126.   At the direction of Defendants, Cesario continued to engage Plaintiff numerous times over the next few days and weeks to restart the crack brokerage and consumption relationship.   Id. ¶ 127.

During the week of Thanksgiving, 2011, Cesario again approached Plaintiff with a "seductive and alluring offer": "if you score [crack] for me, I will hook you up sick", meaning

that if Plaintiff purchased crack for him, Cesario would pay Plaintiff "a large amount" of crack as a broker fee.   Id. ¶ 128.   "As a result of the seductive allure of the offer of a large amount of Crack Cocaine (generated and fueled by nearly two decades of addiction to Crack Cocaine . . .), compounded by the stress to meet the demands of everyday life and the arduous effort to heal the relationship with his children and other family members," Plaintiff agreed to "act as a broker to obtain Crack Cocaine in return for payment of a large amount" of crack for his personal use. Id. ¶ 129.

Accordingly, on November 30, 2011, Plaintiff brokered a transaction in which he purchased one quarter of an ounce of crack for Cesario and another confidential informant, Jason.     With Defendants' knowledge and approval, Cesario and Jason provided Plaintiff with a "large portion" of the crack.   Id. ¶ 130.   Plaintiff used the crack over a period of two days, resulting in the "resurrection" of his "crippling" crack addiction.   Id. ¶ 132.

A few days later, Cesario contacted Plaintiff to arrange for the purchase of $40 to $50 worth of crack, in exchange for payment to Plaintiff in the form of crack for his personal use. Id. ¶ 134.   Thereafter, "this pattern of arrangement of the acquisition of $40-$50 worth of Crack Cocaine to 1/3 ounce of Crack Cocaine for Cesario in exchange for payment of Crack Cocaine to [Plaintiff] for consumption continued 2-3 times per week from early December 2011 through May 2012."   Id. ¶ 148.   Additionally, on two occasions in December and January 2012, Jason used Plaintiff "to arrange for the acquisition of ¼ ounce of Crack Cocaine in exchange for payment of Crack Cocaine to [Plaintiff] for consumption."   Id. ¶ 150.

Once his addiction was reignited, Plaintiff's "life devolved again into a situation in which [he] was penniless and unable to escape from his addiction [or] to seek employment."   Id. ¶

151.    Further, Plaintiff "once more suffered the loss of his relationships" with his family.    Id. ¶ 230.

On August 7, 2012, a federal grand jury returned an Indictment charging Plaintiff with seven counts of distribution of a mixture and substance containing a detectable amount of cocaine base within 1,000 feet of New Mexico Highlands University, in violation of 21 U.S.C. § 860(a), and one count of opening, leasing, renting, using, or maintaining a residence for the purpose of distributing and using controlled substances, in violation of 21 U.S.C. § 856(a)(1). Doc. 23-2 (Indictment).    The distribution charges stemmed from drug transactions that Plaintiff had brokered for confidential informants Cesario and Jason on November 30, 2011, December 8, 2011, December 29, 2011, January 6, 2012, and January 12, 2012.    Id.    Ultimately, the government moved to dismiss the Indictment as to Plaintiff, and on January 16, 2013, the Court entered an order dismissing the Indictment as to Plaintiff.    Doc. 23-3.

Based on this series of events, Plaintiff claims that Defendants improperly restarted Plaintiff's crack addiction and used his addiction to further their investigative goal of targeting drug trafficking suspects, and to stack drug related charges against Plaintiff.    Doc. 23 ¶¶ 93, 98, 100.    As a result of these alleged improprieties, on July 14, 2014, Plaintiff commenced the instant action.    In his First Amended Complaint, Plaintiff sets forth claims against Defendant United States, under the Federal Tort Claims Act, for negligence and intentional infliction of emotional distress (Counts I and II), and claims against each of the individual Defendants (Castleberry, Whelan, Mayfield, Brown, and Arabit) (the "Individual Defendants"), under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), for violation of Plaintiff's Fifth Amendment substantive due process rights to be free from bodily harm and to be free from deprivation of liberty without due process of law, violation of his First Amendment right to a

continuing relationship with his family, and civil conspiracy to commit constitutional violations against him (Counts III through XVIII).

On January 9, 2015, Defendants Castleberry and Whelan filed their motion to dismiss the First Amended Complaint, arguing that there is no *Bivens* action for Plaintiff's claims, and that even if there were such an action, Plaintiff's claims would be barred by qualified immunity. Also on January 9, 2015, Defendant Mayfield filed his motion to dismiss on similar grounds. On February 17, 2015, Defendants Arabit and Brown filed a motion to dismiss all of the claims against them on qualified immunity grounds, and thereafter, on March 12, 2015, filed a second motion to dismiss, arguing that there is no *Bivens* action for Plaintiff's Fifth Amendment due process claims.    Plaintiff opposes the Individual Defendants' motions to dismiss.

## DISCUSSION

Plaintiff alleges that the Individual Defendants knowingly caused the deliberate relapse of Plaintiff's addiction to crack and thereafter continued to distribute crack to Plaintiff for his consumption, in order to use Plaintiff's addiction to further their investigative goals and to stack charges against him.    Based on these allegations, Plaintiff claims that the Individual Defendants engaged in conduct that "shocks the conscience" in violation of Plaintiff's substantive due process rights, deprived Plaintiff of his protected liberty interest in familial companionship, and conspired to commit these violations of his First and Fifth Amendment rights.    The Individual Defendants move to dismiss on two separate grounds.    First, they argue that there is no recognized *Bivens* action for Plaintiff's claims.    Second, they argue that even if the Court were to recognize a *Bivens* action, dismissal of Plaintiff's claims is required on the basis of qualified immunity.    As set forth herein, the Court agrees that Plaintiff has failed to allege facts sufficient to show that the Individual Defendants plausibly violated his constitutional rights and/or that

those rights were clearly established at the time, and thus that Plaintiff's claims against the

Individual Defendants must be dismissed on the basis of qualified immunity.   Accordingly, the

Court need not reach the issue of whether Plaintiff's claims are properly brought pursuant to

*Bivens*.

I.      Standard on Motion to Dismiss on the Basis of Qualified Immunity

Under Rule 12(b)(6), a Court may dismiss a complaint for "failure to state a claim upon

which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint."   *Mobley v.*

*McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).   When considering a Rule 12(b)(6) motion, the

Court must accept as true all well-pleaded factual allegations in the complaint, view those

allegations in the light most favorable to the non-moving party, and draw all reasonable

inferences in the plaintiff's favor.   *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir.

2009), *cert. denied*, 130 S. Ct. 1142 (2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citations omitted).   "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."   *Id.*   "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of entitlement to relief.'"   *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

557 (2007)).

The Court in *Iqbal* identified "two working principles" in the context of a motion to

dismiss.   *Id.*   First, "the tenet that a court must accept as true all of the allegations contained in

a complaint is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice."   *Id.*   Accordingly, Rule 8

"does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions." *Id.* at 678-79.   "Second, only a complaint that states a plausible claim for relief

survives a motion to dismiss."   *Id.* at 679; *see Twombly*, 550 U.S. at 570 (holding that a plaintiff

must "nudge" her claims "across the line from conceivable to plausible").   Accordingly, "where

the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to

relief."   *Id.* (citation omitted).

> In keeping with these two principles, the Court explained,
>
> a court considering a motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than conclusions, are not entitled to the
> assumption of truth.   When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they plausibly give rise
> to an entitlement to relief."

*Id.* at 679.

In the instant case, the Individual Defendants move to dismiss on the basis of qualified

immunity.   Qualified immunity protects government officials performing discretionary

functions "when their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."   *Brown v. Montoya*, 662 F.3d 1152,

1164 (10th Cir. 2011).   The Court employs a two-part test to analyze a qualified immunity

defense.   *Id.*   Accordingly, "[i]n resolving a motion to dismiss based on qualified immunity, a

court must consider whether the facts that a plaintiff has alleged make out a violation of a

constitutional right, and whether the right at issue was clearly established at the time of

defendant's alleged misconduct."   *Id.*[1]   The Court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"   *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his [or her] actions violate that right."   *Lundstrom*, 616 F.3d at 1118-19 (citation omitted).   "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."   *Fisher v. City of Las Cruces*, 584 F.3d 888, 900 (10th Cir. 2009) (citation omitted).   Accordingly, a "plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it."   *Lundstrom*, 616 F.3d at 1119. Specifically, a "plaintiff must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue."   *Id.*

This does not mean that the plaintiff must "present a case with an identical factual situation."   *Id.*   To the contrary, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).   The "salient question" thus is whether the state of the law at the time of the alleged misconduct gave the defendant "fair warning" that his or her alleged misconduct was unconstitutional.   *Id.*   To answer this question in the affirmative, ordinarily, there must be "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff

---

[1] The qualified immunity analysis in the context of a *Bivens* action is identical to that applied in an action brought under 42 U.S.C. Section 1983.   *Wilson v. Layne,* 526 U.S. 603, 609 (1999).

maintains." *Brown*, 662 F.3d at 1164 (citation omitted).   In response to a motion to dismiss, the plaintiff has the burden "of articulating such clearly-established law."   *Walker v. City of Orem*, 451 F.3d 1139, 1151 (10th Cir. 2006).

II.   Plaintiff's Substantive Due Process Claims

Plaintiff states two substantive due process claims against each of the Individual Defendants.   First, in Counts III, VI, IX, XII, and XV, Plaintiff alleges that the Individual Defendants violated his Fifth Amendment liberty interest in bodily security by knowingly causing the relapse of Plaintiff's crack addiction and intentionally continuing to distribute crack to Plaintiff.   Doc. 23 ¶¶ 323, 364, 403, 451, 490.   Second, in Counts IV, VII, X, XIII, and XVI, Plaintiff alleges that the Individual Defendants violated his Fifth Amendment rights to be free from deprivation of liberty interests without due process of law, or corruption of the processes of law that shocks the conscience, by utilizing his crack addiction to "stack drug-related charges" against Plaintiff.   Id. ¶¶ 339, 343, 380, 383, 422, 425, 460, 463, 497, 501. The essence of each of these claims is that the Individual Defendants engaged in outrageous government conduct in violation of Plaintiff's substantive due process rights.

A.   Outrageous Government Conduct in Violation of Substantive Due Process

"The Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."   *Doe v. Heil*, 533 F. App'x 831, 841 (10th Cir. 2013), *cert. denied*, 134 S. Ct. 1309 (2014) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).   "The 'ultimate' standard for determining whether there has been a substantive due process violation is 'whether the challenged government action shocks the conscience of federal judges.'"   *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th

11

Cir. 2002)).   "[A] plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."   *Ruiz*, 299 F.3d at 1184. Importantly, the right to substantive due process is not implicated unless "the Government activity in question violates some protected right."   *Hampton v. United States*, 425 U.S. 484, 490 (1976).

The Tenth Circuit has held that "outrageous government conduct" during a criminal investigation may be challenged as a substantive due process violation.   *United States v. Mosley*, 965 F.2d 906, 908-09 (10th Cir. 1992).   "The notion of outrageous government conduct was first recognized in *United States v. Russell*, 411 U.S. 423 (1973)."   *United States v. Harris*, 997 F.2d 812, 815 (1993).   In *Russell*, the Supreme Court stated:   "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."   411 U.S. at 431-32.   In order to rise to that level, law enforcement conduct must violate "that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment."   *Id.* at 432.

While "most of the circuits . . . have recognized the viability of the outrageous government conduct defense, and no circuit has yet denied the existence of the defense, the Tenth Circuit noted in *Harris* that this "amorphous defense" is "so rarely accepted that [it has] found only two circuit court decisions setting aside convictions on that basis," and only a "handful" of district court cases utilizing the defense to dismiss charges.   *Harris*, 997 F.2d at 816.   Further, "[n]o federal court has defined the requirements of the outrageous conduct defense with any degree of precision."   *Mosley*, 965 F.2d at 910.   The varied formulations of the outrageousness requirement share the same "thrust":   "that the challenged conduct must be

shocking, outrageous, and clearly intolerable."   *Id.*

The Tenth Circuit has held that "the defense of outrageous conduct is manifestly reserved for only the most intolerable government conduct."   *Harris*, 997 F.2d at 815-16 (citation omitted); *see also Mosley*, 965 F.2d at 910 ("[T]his is an extraordinary defense reserved for only the most egregious circumstances.").   In particular, "[i]t is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating."   *Mosley*, 965 F.2d at 910.   Further, because "[g]overnment agents often need to play the role of criminals in order to apprehend criminals, and this role occasionally entails unseemly behavior[,] . . . [w]ide latitude is accorded the government to determine how best to fight crime."   *Id.*

In *Mosley*, the Tenth Circuit articulated and elucidated two primary factors that had been considered in cases where the government's conduct was found to be outrageous:   "excessive government involvement in the creation of the crime, and significant governmental coercion to induce the crime."   *Harris*, 997 F.2d at 816 (citing *Mosley*, 965 F.2d at 911).   With regard to the first factor, the Tenth Circuit explained that, "[w]here the government essentially generates new crime for the purpose of prosecuting it or induces a defendant to become involved for the first time in certain criminal activity, as opposed to merely interposing itself in an ongoing criminal enterprise, such conduct has occasionally been held to be outrageous."   *Mosley*, 965 F.2d at 911.   Thus, "the government may not engineer and direct the criminal enterprise from start to finish."   *Id.* (citations omitted).   The Court, however, made clear that "it is not outrageous for the government to infiltrate an ongoing criminal enterprise," or "to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity."   *Id.*   Further, "[i]n order to induce a suspect to repeat, continue, or expand criminal activity, the government can suggest that illegal activity."   *Id.*   The government also

"can provide supplies and expertise for the illegal activity," and "act as both supplier and buyer in sales of illegal goods." *Id.* at 912.

With regard to the second factor, the Tenth Circuit explained that government coercion to induce the defendant to commit the crime, even if such conduct falls short of physical force, has been held to be outrageous. *Id.* at 912. The Court noted, however, that "coercion of any type must be particularly egregious before it will sustain an outrageous conduct defense." *Id.* Accordingly, the Court explained, government agents may use "appropriate artifice and deception in their investigation, may make excessive offers, and may even use "threats or intimidation if not exceeding permissible bounds." *Id.* (citations omitted).

In *Harris*, the Tenth Circuit articulated a third factor for consideration in determining whether conduct rises to the level of outrageousness, namely whether the government initiated multiple charges "with an addict who was merely acting as a middleman" for the primary purpose of "stacking charges" against him. 997 F.2d at 818-19. Specifically, the Court explained that "[a]bsent a specific investigatory purpose," the agent could not continue to conduct these transactions *ad infinitum* thereby constantly increasing the charges, which necessarily increases the attendant mandatory sentence length." *Id.* The Court clarified that "[s]uch conduct is not necessarily outrageous, however, since multiple transactions may, under appropriate circumstances, serve a legitimate investigatory function." *Id.* at 819. Because "[a]n undercover agent cannot always predict what information he will learn in the course of his investigation[,] . . . police must be given leeway to probe the depth and extent of a criminal enterprise to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy." *Id.* Thus, the Court stated that "it would be imprudent for [it] to adopt a per se rule prohibiting multiple transactions when an addict is involved." *Id.* Nonetheless,

the Court held that "[w]here the evidence shows . . . that law enforcement personnel rely on a known addiction to carry out multiple transactions *with the primary purpose* of stacking charges, the government has engaged in outrageous conduct violative of the defendant's due process rights."   *Id.* (emphasis added).   The Court remanded the case for further proceedings consistent with its opinion, because the record was "unclear regarding the extent of the government's knowledge of the defendant's addiction, the reliance on that addiction to conduct multiple transactions, and if any other purpose was served by the multiple transactions."   *Id.*

      B.      <u>Plaintiff's Allegations of Outrageous Government Conduct</u>

    As noted above, Plaintiff brings two substantive due process claims against the Individual Defendants.   Specifically, Plaintiff alleges that the Individual Defendants violated his Fifth Amendment due process rights by:   (1) offering Plaintiff, a known drug addict, drugs in exchange for brokering drug transactions, and after he accepted that offer, continuing to provide him drugs in exchange for brokering drug transactions, thereby causing his re-addiction to crack, and utilizing that addiction to further the goals of their investigation; and (2) engaging in multiple drug transactions with Plaintiff, a known addict, thereby stacking drug distribution charges against him and increasing the applicable penalties associated with those charges.   The Individual Defendants argue that both of these categories of claims must be dismissed on the basis of qualified immunity, because: (1) Plaintiff has failed to allege facts that show that their conduct violated his substantive due process rights; and (2) Plaintiff has failed to demonstrate that his right to substantive due process, in the specific context of his claims, is supported by clearly established law.

      1.      <u>Offering and Continuing to Provide Plaintiff with Drugs in Exchange for Brokering Drug Transactions</u>

    Under the standard set forth in *Mosley* and *Harris*, the Individual Defendants' alleged

conduct in offering and continuing to provide Plaintiff with drugs in exchange for brokering drug transactions violated Plaintiff's substantive due process rights if it was "shocking, outrageous, and clearly intolerable," either because the Individual Defendants were "overly involved" in the creation of Plaintiff's drug distribution offenses, or "coerced" him into participating in those offenses. *Mosley*, 965 F.2d at 910, 912.   The Court need not reach this constitutional question, however, as "prior case law has not clearly settled the right [at issue here], and so given officials fair notice of it." *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011).   In other words, in light of pre-existing law, a reasonable agent in the Individual Defendants' position would not have known that offering Plaintiff drugs in exchange for brokering drug transactions, under the circumstances presented to them, violated Plaintiff's due process rights under the Fifth Amendment.

As an initial matter, the contours of the due process right to be free from outrageous government conduct are decidedly unsettled:   neither the Supreme Court, nor the Tenth Circuit, nor any other federal court has defined the standard of outrageous government conduct "with any degree of precision." *Mosley*, 965 F.2d. at 910.   Further, while recognizing the notion that outrageous government conduct can violate due process, neither the Tenth Circuit, nor the Supreme Court, has ever accepted this "amorphous defense." *Harris*, 997 F.2d at 816. Perhaps most importantly, in *Harris*, the Tenth Circuit considered and rejected an argument of outrageous government conduct in the context of factual circumstances analogous to those here.

Specifically, in *Harris*, the Tenth Circuit reversed a district court order dismissing charges in an indictment based on a finding of outrageous government conduct.   997 F.2d at 814.   Harris was charged in a three-count indictment for his role in facilitating the purchase of crack cocaine for an undercover agent. *Id.*   The agent "instigated a meeting" with Harris "in

16

an effort to obtain an eighth of an ounce of rock cocaine." *Id.* Harris acted as a middleman between the agent and his own dealer in a transaction for an eighth of an ounce of rock cocaine. *Id.* Instead of paying Harris cash for brokering the transaction, "the arrangement was to give [him] a cut of the cocaine sold." *Id.* Thereafter, the agent again contacted Harris, and expressed an interest in executing a similar transaction. *Id.* Harris again brokered a transaction between his dealer and the agent, obtaining one-fourth of an ounce of crack. The agent again gave Harris part of the crack "for his compensation." *Id.* Harris, a third time, brokered a transaction for the agent in which he purchased one-fourth of an ounce of crack. Harris argued that "he engaged in the transactions because he was promised he would receive a large enough cut of the cocaine to make it worth his while." *Id.* at 815. The Tenth Circuit found that Harris "would most accurately be categorized as an addict whose sole motivation" for brokering the transactions for the agent "was to obtain some cocaine for himself." *Id.*

In determining whether, based on these facts, the agent engaged in outrageous government conduct, the Tenth Circuit applied the two factors enumerated in *Mosley*. First, with regard to involvement in the creation of the crime, the Court held that "the government did not engineer the distribution crime for which Defendant was charged." *Id.* at 816. The Court acknowledged that the government had "initiated the transaction," but held that "the government's role in instigating the transaction and acting as a buyer does not amount to creating the crime." *Id.* The Court noted that it was Harris who "arranged and directed" the transaction by calling his source and acting as an intermediary in transporting the cocaine and money between his source and the agent. *Id.* Certainly, the Court explained, "it is permissible for the government to merely suggest an illegal activity." *Id.*

Next, with regard to coercion, the Court found "wholly without legal support" the district

court's holding below that the agent's conduct was excessively coercive, and thus outrageous, because he distributed narcotics in the course of a drug transaction, without a safety justification for doing so. *Id.* at 817. The Court explained that the district court's interpretation of the Controlled Substances Act to provide no exception for undercover agents "does not consider the practical effect of such a holding." *Id.* Specifically, the Court stated that thus "[d]etermining that government distribution of narcotics constitutes outrageous conduct in and of itself would hinder a police department's ability to engage in successful undercover operations." *Id.* The Court further noted that its previous holdings allow the government to "act as both supplier and buyer in sales of illegal goods," and to "set up a reverse sting operation, in which agents distribute narcotics." *Id.*

Nonetheless, the Court found that "[t]he issue becomes cloudier . . . when the government distributes narcotics to a known addict," and noted that previous court rulings had "intimated that such conduct might indeed be outrageous." *Id.* Harris argued that the agent "preyed upon [his] addiction by promising to reward him with cocaine for his assistance." *Id.* Given this argument, the Court concluded that the agent's "method of compensation" was relevant to an outrageous conduct determination. *Id.*

Noting that "the facts of each individual case are pivotal in making an outrageous conduct determination," the Court examined other cases in which the government supplied narcotics to a known addict. *Id.* In each of those cases, the court rejected the argument that the government's distribution of drugs constituted outrageous conduct. *See United States v. Ford*, 918 F.2d 1343, 1349-50 (8th Cir. 1990) (where government provided cocaine and heroin to a thirty-year heroin addict, holding that "an undercover officer's providing a known addict with small quantities of drugs to facilitate and enhance the undercover relationship does not

constitute outrageous conduct"); *United States v. Valona*, 834 F.2d 1334, 1344 (7th Cir. 1987)

(holding that while court should "closely examine government conduct when the government

supplies the contraband," the allegations that an undercover agent provided defendant with a 3.5

gram sample of cocaine fell "well short of suggesting a due process violation"); *United States v.*

*Barrera-Moreno*, 951 F.2d 1989, 1091-92 (9th Cir. 1991) (where confidential informant

frequently used cocaine with one defendant to the point where the defendant became addicted,

and supplied another defendant with cocaine for personal use in exchange for brokering

transactions, holding that, even if the government directed the informant's activities, there was

no due process violation).

   Consistent with those decisions, the Tenth Circuit opined:

> Any definitive rule of law concerning whether a government agent's sale of
> narcotics to a known addict constitutes outrageous government conduct would
> necessarily be flawed.   On many occasions, a government agent might not be
> able to infiltrate a drug ring and be taken into confidence of the illegal
> entrepreneurs unless he has the authority to distribute contraband.   Necessarily,
> many of the transactions with dealers are also transactions with addicts and
> disallowing such transactions would severely inhibit the undercover operation.

*Id.* at 818.   Accordingly, the Court concluded that "it would be nonsensical to promulgate a rule

holding outrageous government conduct each and every time the government distributed

narcotics to a known addict."   *Id.*   On the other hand, the Court stated that "any rule that

permits unlimited sales of narcotics to known addicts would also lack merit.   At a certain

threshold, the government's conduct would violate due process."   *Id*.   For instance, the Court

"speculate[d] that if a government agent entered a drug rehabilitation treatment center and sold

heroin to a recovering addict, and the addict was subsequently prosecuted for possession of a

controlled substance, the outrageous government conduct defense might properly be invoked."

*Id.*

19

Applying the "outrageous conduct framework" drawn from other cases, the Court concluded that the facts in the case before it were not "egregious enough to violate due process." *Id.*  "By way of comparison," the Court stated, the agent's "conduct was no more egregious than the government conduct held not to be outrageous in the *Ford*, *Valona*, and *Barrera-Moreno* cases.   *Id.*   Although conceding that the agent "may have enticed the Defendant to participate in the transaction," the Court held that Harris "was not coerced to the point of outrageousness."   *Id.*

Given the similarity of the instant facts to those in *Harris*, "the state of the law" at the time of the Individual Defendants' alleged misconduct did not give them "fair warning" that their alleged misconduct was unconstitutional.   *Hope*, 536 U.S. at 741.   Like Harris, Plaintiff admittedly is a long-time drug addict, who was arrested for his role in facilitating the purchase of crack cocaine for a confidential informant.   As did the undercover agent in Harris, the confidential informants working in connection with the DEA undercover investigation at issue here "instigated a meeting" in an effort to obtain crack cocaine, and, instead of paying Defendant in cash for brokering the transaction, the informant arranged to give him a cut of the cocaine sold.   Much as Harris argued that he engaged in the transactions because of the promise of a "large enough cut of the cocaine to make it worth his while," Plaintiff alleges that the informant approached him with a "seductive and alluring offer" to pay him a "large amount" of crack as a broker fee, and that he agreed to "act as a broker to obtain Crack Cocaine in return for payment of a large amount" of crack for his personal use.

As noted above, the Court in *Harris* held that the government's role in initiating the drug transaction, and the method by which Harris would be paid, did not constitute excessive involvement in the creation of the crime.   To the contrary, the Court found that the

government's "suggestion" of illegal activity was "certainly" permissible.    Accordingly, in light of *Harris*, the Individual Defendants would not have had "fair warning" that their alleged conduct in directing the informants to initiate the drug transactions with Plaintiff, or to suggest that Plaintiff broker drug deals in exchange for drugs, would constitute outrageous conduct.    *Id.*

Further, the Court in *Harris* declined to find coercion to the point of outrageousness where the agent enticed Harris, a known drug addict, with the promise of rewarding him with large amounts of cocaine in exchange for his assistance.    As an initial matter, the Court clarified that undercover agents are not prohibited by the federal drug laws from distributing narcotics. Further, although stating that the issue "becomes cloudier" when the government distributes drugs to a known drug addict, the Court left the issue cloudy.    That is, the Court declined to establish any "definitive rule of law" delineating when the sale of narcotics to known addicts would cross the line from proper law enforcement tactics (as had been found in all of the cases to which it cited) to coercion amounting to outrageous conduct (the contours of which it only speculated).    Accordingly, in light of *Harris*, the Individual Defendants would not have "fair warning" that their alleged conduct in enticing Plaintiff, a known drug addict, with a "seductive and alluring offer" of "large amounts" of crack, and in continuing to provide drugs to Plaintiff in exchange for his brokering of drug transactions, would constitute outrageous conduct.    *See Hope*, 536 U.S. at 741.

Indeed, because the relevant Supreme Court cases discuss the theory of outrageous conduct but do not find outrageous conduct on the facts before them, a reading of those cases would have made it no more apparent to the Individual Defendants that their conduct violated Plaintiff's due process rights.    *See Russell*, 411 U.S. at 424-25 (reversing the judgment of the Ninth Circuit, which had reversed a defendant's conviction on the basis of outrageous conduct

where an undercover agent had supplied an essential chemical for manufacturing the methamphetamine that formed the basis of the conviction, explaining that the government's conduct stopped "far short of violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause, and noting that "the infiltration of drug rings and a limited participation in their unlawful present practices . . . is a recognized and permissible means of investigation); *Hampton*, 425 U.S. at 489-90 (holding that police conduct in allegedly supplying defendant with illegal drugs that defendant then sold to undercover agents "no more deprived defendant of any right secured to him by the United States Constitution than did the police conduct in *Russell* deprive Russell of any rights").   Further, as the cases cited by the Tenth Circuit in *Harris* demonstrate, other jurisdictions have provided no more guidance as to what does, as opposed to what does not, constitute outrageous government conduct.   *See Ford*, 918 F.2d at 1349-50; *Valona*, 834 F.2d at 1344; *Barrera-Moreno*, 951 F.2d at 1091-92; *see also United States v. Buishas*, 791 F.2d 1310, 1314 (7th Cir. 1986) (holding government's conduct in delivering two samples of marijuana that were "relatively small" in comparison to drugs later confiscated by the government was not so outrageous as to violate due process); *United States v. Santana*, 6 F.3d 1, 7-8 (1st Cir. 1993) (holding that construction of "a *per se* rule, drawing a bright line at some particular quantity of drugs and forbidding lawmen to cross that line in dealing with suspected drug traffickers," is "unprecedented, unworkable, unwise, and thoroughly uninviting").

In response to the Individual Defendants' motions, Plaintiff argues that, to the contrary, Tenth Circuit law clearly established his rights under the Due Process Clause.   In support of this argument, Plaintiff first cites to *Mosley* for the proposition that because the Individual Defendants had "knowledge" of Plaintiff's drug addiction, and "took advantage of that

addiction" to accomplish their goals, they violated his due process rights.   Doc. 71 at 42-43; Doc. 72 at 37; Doc. 123 at 36.   *Mosley*, however, does not stand for this proposition.

In *Mosley*, the defendant argued on appeal that his drug addiction should be considered as a factor in his claim that he was coerced to participate in the drug transaction with an undercover agent.   Because the defendant had not "argued addiction" in the district court as a basis for his outrageous conduct claim, however, and because there was no evidence of addiction presented to the district court, the Tenth Circuit held that it could not "conclude that the district court erred by denying Mosley's motions notwithstanding his addiction."   965 F.2d at 914.   The Court added that, even if it had considered the evidence of the defendant's addiction, it "would not [have] come out differently," because no proof had been offered that the government "knew of, much less took advantage of, Mosley's addiction."   *Id.*

Thus, the Court in *Mosley* never answered the question of whether agents who distribute narcotics to drug addicts thereby coerce their participation in violation of the Fifth Amendment. As discussed above, however, one year later in *Harris*, the Tenth Circuit did answer this question on the facts before it – in the negative – and specifically declined to make "any definitive rule of law concerning whether a government agent's sale of narcotics to a known addict constitutes outrageous government conduct."   997 F.2d at 818.   Accordingly, *Mosley* cannot be read to have put the Individual Defendants on notice that their conduct violated Plaintiff's due process rights.

Next, Plaintiff argues that *Harris* clearly established that reigniting an individual's drug addiction and using that drug addiction to pressure the individual into participating in drug transactions violates due process.   Doc. 71 at 43-45; Doc. 72 at 38-39; Doc. 123 at 36-38.   In support of this argument, Plaintiff highlights the language in *Harris* where the Court noted that:

23

the propriety of government conduct in distributing drugs "becomes cloudier" when an addict is involved; district courts have "intimated" that such conduct might be outrageous; and the court should "closely examine" government conduct involving the supply of contraband.   None of these statements, however, clearly defines the contours of the right to be free from outrageous government conduct.   *Lundstrom*, 616 F.3d at 1118-19.   To the contrary, these statements reinforce the lack of such contours which, as the Court stated, differ depending on "the facts of each individual case."   *Harris*, 997 F.2d at 817.

Plaintiff further cites to the *Harris* Court's speculation that "the outrageous conduct defense *might properly be invoked*" where "a government agent entered a drug rehabilitation treatment center and sold heroin to a recovering addict, and the addict was subsequently prosecuted for possession of a controlled substance."   *Id.* at 818 (emphasis added).   According to Plaintiff, the Court's speculation is determinative here, because at the time Cesario "reappeared" as a government informant, Plaintiff had been in a period of self-recovery for four to five months, and repeatedly rejected the informants' request to participate in drug transactions. Doc. 71 at 44; Doc. 72 at 39; Doc. 123 at 38.   Plaintiff describes this as "a nearly identical correlation to the example set forth by the Tenth Circuit."   *Id.*

As an initial matter, the Court cannot agree that the circumstances here are analogous to those in the Court's hypothetical.   According to Plaintiff's own allegations, before Cesario disappeared in mid-summer 2011, for at least six or seven months, Cesario and Plaintiff had been engaging in the very same "brokerage and consumption relationship" that Cesario "instigated" in connection with the government's undercover investigation when he returned to Las Vegas. Plaintiff admits that it was he who suggested that Cesario participate in such a "brokerage and consumption relationship" in the first instance, in an "effort to establish a reliable process to

obtain crack for his own use," and that it was only "in reaction" to Plaintiff's offer that Cesario agreed to his proposed arrangement.    Further, while Plaintiff alleges that he advised Cesario that he was "clean and intended to remain clean," he does not similarly allege that he indicated that he was participating in any sort of drug treatment program.    Indeed, Plaintiff alleges that by the time Cesario returned, he was no longer incapacitated from an addiction, but rather had emerged from a period of "self-recovery" during which "the fog of addiction" had receded and his craving for crack had "moderated to a tolerable level."    Thus, by his own admissions, Plaintiff was a far cry from being a "recovering addict" confined to a drug rehabilitation treatment center when he was approached by the government's informant.

Further, the *Harris* Court's speculation that government conduct might, in one context, constitute outrageousness was insufficient to put the Individual Defendants on notice that their conduct, in the specific context of this case, violated Plaintiff's due process rights.    As explained above, the Court's speculation as to when the outrageous government conduct defense *might* properly be invoked was, as the Court itself stated, only speculation.    The Court did not definitively state that, in the situation of a recovering addict confined to a drug rehabilitation treatment center – or in any other situation – the government's conduct of selling drugs to the addict necessarily would violate due process.    To the contrary, the Court held that it would be nonsensical to promulgate either a rule "holding outrageous government conduct each and every time the government distributed narcotics to a known addict," or a rule permitting "unlimited sales of narcotics to known addicts."    *Harris*, 997 F.2d at 818.    Accordingly, the Court expressly declined the opportunity to define the contours of outrageous government conduct. By citing to *Harris*, Plaintiff thus has not met his burden of articulating clearly established law.

Plaintiff also argues that, by causing him to ingest the "poisonous chemicals" contained

25

in crack, the Individual Defendants violated his right to bodily integrity.    Doc. 71 at 34; Doc. 72 at 30; Doc. 123 at 24.    "But the Supreme Court has recognized a liberty interest in bodily integrity in only very limited circumstances involving such things as abortions, end-of-life decisions, birth control decisions, and instances where individuals are subject to dangerous or invasive procedures where their personal liberty is being restrained." *Moore*, 438 F.3d at 1039 (citations omitted).    Plaintiff has failed to cite to any authority where the Tenth Circuit, the Supreme Court, or any other court has recognized a liberty interest in bodily integrity in circumstances similar to those here.    Indeed, Plaintiff's argument ignores the holding in *Harris* that the distribution of narcotics in the course of an undercover drug transaction is not outrageous conduct that violates due process.    *See Harris*, 997 F.2d at 817.    Thus, while Plaintiff has established as a "broad general proposition" that he has a right to bodily integrity, he has nonetheless failed to meet his burden of showing any legal authority making it apparent that in light of pre-existing law, a reasonable agent would have known that providing Plaintiff with crack in exchange for brokering drug transactions would violate his right to bodily integrity. *Lundstrom*, 616 F.3d at 1119.

Finally, Plaintiff argues that DEA Policy and Attorney General Guidelines clearly established the law governing his substantive due process claims.    Doc. 71 at 46; Doc. 72 at 40-41; Doc. 123 at 41.    In support of this argument, Plaintiff cites *Groh v. Ramirez*, 540 U.S. 551 (2004), for the proposition that a court may look to a governmental policy or a regulation that proscribes the challenged government conduct to determine whether the employee was aware that the conduct was unlawful.    Doc. 71 at 46; Doc. 72 at 41; Doc. 123 at 41.    Neither *Groh* nor any other case supports Plaintiff's argument that he can meet his burden of articulating clearly-established law by pointing to internal governmental policies.

In *Groh*, the Court specifically indicated that it was not suggesting "that an official is deprived of qualified immunity whenever he violates an internal guideline."   *Id.* at 564 n. 7. Indeed, the Supreme Court has expressly held that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."   *Davis v. Scherer*, 468 U.S. 183, 194 (1984).   The Tenth Circuit consistently has applied this rule.   *See, e.g.*, *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) ("We have, of course, recognized that claims based on violations of state law and police procedure are not actionable under § 1983."); *Herring v. Keenan*, 218 F.3d 1171, 1180 (10th Cir. 2000) ("[T]he fact than an official discloses information in violation of his own internal procedures does not make the disclosure a violation of a clearly established constitutional right to privacy.").   Accordingly, Plaintiff's allegations that the Individual Defendants violated internal government policies fall short of establishing that the state of the law at the time of the alleged misconduct gave the Individual Defendants "fair warning" that their alleged misconduct was unconstitutional.   *Hope*, 536 U.S. at 741.

### 2.   Engaging in Multiple Drug Transactions with Plaintiff

Under the standard set forth in *Harris*, the Individual Defendants' alleged conduct in engaging in multiple drug transactions with Plaintiff violated his substantive due process rights if the evidence shows that the Individual Defendants "rel[ied] on a known addiction to carry out multiple transactions with the primary purpose of stacking charges."   997 F.2d at 819.   The Tenth Circuit in *Harris* declined to adopt a per se rule prohibiting multiple transactions where an addict is involved, but did hold that where agents rely on a known addiction to carry out multiple transactions *with the primary purpose* of stacking charges, the government's conduct rises to the level of outrageousness in violation of due process.   *Id.*   Here, Plaintiff has not alleged facts

27

sufficient to state a plausible due process claim on the basis that the Individual Defendants relied on Plaintiff's known addiction to carry out multiple transactions *with the primary purpose* of stacking charges.

The First Amended Complaint repeatedly alleges that the Individual Defendants provided crack to Plaintiff to further their investigation of drug dealers in Las Vegas, New Mexico; it also repeatedly alleges that the Individual Defendants provided crack to Plaintiff to "stack drug related charges" against him.   *See, e.g.*, Doc. 23 ¶¶ 174, 228, 304.   Although Plaintiff repeatedly uses the phrase "stack drug-related charges," Plaintiff never alleges that any of the Individual Defendant acted *with the primary purpose* of stacking charges.   Accordingly, even if accepted as true, Plaintiff's allegations do not make out a violation of outrageous conduct based on the government's reliance on a known addiction to carry out multiple transactions *with the primary purpose* of stacking charges.

Similarly, Plaintiff simply states, repeatedly, that the Individual Defendants provided crack to Plaintiff to stack drug-related charges.   Plaintiff never provides any "well-pleaded" facts to support his conclusion that the Individual Defendants acted with the purpose – primary or otherwise – of stacking charges.   Plaintiff's allegations regarding "stacking drug-related charges" thus are "bare assertions" that "amount to nothing more than a formulaic recitation of the elements" of an outrageous government conduct claim under *Harris*.   *Iqbal*, 556 U.S. at 681.   "As such, the allegations are conclusory and not entitled to be assumed true."   *Id.*

Further, to the extent that Plaintiff's allegations are considered to be non-conclusory factual allegations, they are merely consistent with his theory that the Individual Defendants acted with the primary purpose of stacking charges, "but given more likely explanations, they do not plausibly establish this purpose."   *Id.*   The First Amended Complaint states that, prior to

Cesario's disappearance in mid-summer 2011, for at least six or seven months, Plaintiff had brokered transactions for Cesario whereby Plaintiff obtained drugs for Cesario from local drug traffickers.   On the facts that Plaintiff alleges, the undercover investigation in which the Individual Defendants directed Cesario and another confidential informant to use Plaintiff to broker transactions in a similar fashion was likely lawful and justified by the government's intent to uncover the identity of the various drug traffickers who served as Plaintiff's suppliers.   *See* Doc. 23 ¶¶ 98-102 (referring to Plaintiff introducing confidential sources to other drug trafficking targets); ¶ 168 (same); ¶ 173 (alleging that the government "continued to utilize" Plaintiff's addiction "to further the investigation of drug traffickers in Las Vegas, New Mexico").   Consistent with this legitimate investigative purpose, the grand jury found probable cause to believe that Plaintiff used at least three different suppliers to obtain the crack that he distributed to confidential sources during the multiple transactions at issue.   *See* Doc. 23-1 (charging Paul Ulibarri, George Barela, and Ruby Aragon with drug distribution through transactions involving Plaintiff).   As between "the obvious alternative explanation" for the government's use of Plaintiff to broker drug transactions, and the purposeful stacking of charges that Plaintiff asks the Court to infer, the purposeful stacking of charges "is not a plausible conclusion."   *Id.* at 682.   Accordingly, Plaintiff "has not nudged his claims" of outrageous conduct, based on the government's reliance on a known addiction to carry out multiple transactions with the primary purpose of stacking charges, "across the line from conceivable to plausible."   *Id.* at 680.

Plaintiff argues that, based on his allegations that the Individual Defendants stacked a total of nine related charges against him, their actions "fall dead center into the decision in [] *Harris* regarding use of addiction to "stack drug-related charges."   Doc. 71 at 45; Doc. 72 at 40;

Doc. 123 at 39.   Accordingly, Plaintiff argues, *Harris* clearly establishes that the Individual Defendants violated his due process rights.   *Id.*   Admittedly, Plaintiff's well-pleaded allegations establish that he brokered multiple transactions for the government's informants, and that those transactions formed the basis for the drug distribution charges in the Indictment returned against him.   Those same allegations, however, do not establish that the Individual Defendants acted with the primary purpose of stacking charges against Plaintiff.   In *Harris*, the Tenth Circuit stated that the act of engaging in multiple transactions with an addict "is not necessarily outrageous," as "multiple transactions may, under appropriate circumstances, serve a legitimate investigatory function."   997 F.2d at 819.   Recognizing that "[a]n undercover agent cannot always predict what information he will learn in the course of an investigation," and thus "must be given leeway to probe the depth and extent of a criminal enterprise . . . to trace the drug deeper into the distribution hierarchy," the Court declined to adopt a per se rule prohibiting multiple transactions when an addict is involved.   *Id.*   Accordingly, the Court did not "settle" the law regarding the constitutionality of relying on an addict to carry out multiple transactions, where there is an investigatory purpose for those transactions.   Here, where Plaintiff's allegations establish that there was, in fact, an investigatory purpose for the "brokerage and consumption relationship" between him and the informants, a reasonable agent in the Individual Defendants' position would not have understood that his actions violated Plaintiff's due process rights.   Accordingly, Plaintiff's citation to *Harris* is insufficient to meet his burden of articulating clearly-established law.   Thus, in connection with his due process claim based on the alleged stacking of charges, Plaintiff has failed to meet his burden under either prong of the qualified immunity analysis.

30

III.   Plaintiff's Familial Association Claims

In Counts V, VIII, XI, XIV, and XVII, Plaintiff alleges that each of the Individual

Defendants took "affirmative actions" to produce "the deliberate relapse of plaintiff's addiction

to Crack Cocaine," thereby causing the destruction of plaintiff's familial relationship."   Doc. 23

¶¶ 354, 392, 434, 473, 509.   Additionally, as to Defendants Whelan and Mayfield, Plaintiff

alleges that "the continued and intentional distribution of Crack Cocaine to Plaintiff . . . with

reckless and deliberate indifference also caused the destruction of Plaintiff's familial

companionship."   Id. ¶ 393, 435.   Plaintiff further alleges that each of the Individual

Defendants knew or should have known that by distributing crack cocaine to Plaintiff and

deepening his addiction, plaintiff's familial relationships would be adversely affected."   Doc.

23 ¶¶ 355, 394, 436, 471, 510.   Based on these allegations, Plaintiff claims that each of the

Individual Defendants violated Plaintiff's constitutionally protected interest in familial

companionship.   Id. ¶¶ 356, 395, 437, 475, 511.

In *Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cty.*, 768 F.2d 1186 (10th Cir. 1985), the

Tenth Circuit recognized the right to intimate or familial association as a

constitutionally-protected liberty interest.   *Bryson v. City of Edmond*, 905 F.3d 1386, 1393

(10th Cir. 1990).   In order to state a *Bivens* claim based on a deprivation of this right, however,

"an allegation of intent to interfere with a particular relationship protected by the freedom of

intimate association is required."   *Id.* (quoting *Trujillo*, 768 F.2d at 1190); *see also Estate of

B.I.C. v. Gillen*, 710 F.3d 1168, 1175 (10th Cir. 2013).   In other words, alleged conduct by

government actors "will work an unconstitutional deprivation of the freedom of association only

if the conduct was directed at that right."   *Trujillo*, 768 F.2d at 1190.   Accordingly, where a

plaintiff fails to allege any specific intent to interfere with his familial relationship, his claim is

subject to dismissal for failure to state a constitutional claim.   *Id.; Estate of B.I.C.*, 710 F.3d at 1175.

Under this standard, the facts that Plaintiff has alleged in support of his familial association claim do not make out a violation of a constitutional right.   Read in the light most favorable to Plaintiff, the First Amended Complaint alleges that the Individual Defendants acted with the intention of restarting Plaintiff's crack addiction and maintaining that addiction for their own purposes of investigating drug related activities and obtaining charges based on those activities.   Nowhere in the First Amended Complaint, however, "is there an allegation that any claimed acts or omissions, however intentional, occurred with the specific intent on the part of the [Individual Defendants] to deprive Plaintiff of his rights of association" with his family. *Bryson*, 905 F.2d at 1394.   Further, Plaintiff's allegations that the Individual Defendants "knew, or should have known that by [their] actions" Plaintiff's familial relationships would be adversely affected "does not meet the *Trujillo* requirement."   *Id.* at 1393-94.

In response to the Individual Defendants' motions, Plaintiff argues that he nonetheless has met the specific intent requirement by alleging that the Individual Defendants had knowledge and training as DEA special agents and/or supervisors regarding the destructive effects of drug addiction to familial relationships, and intended to resurrect Plaintiff's drug addiction and utilize his drug addiction to serve their purposes.   Doc. 71 at 38; Doc. 72 at 33; Doc. 123 at 31-32.   In effect, Plaintiff argues that although he did not actually allege intent to interfere with his familial relationships, his allegations regarding the Individual Defendants' knowledge and intent to commit other acts, read in combination, somehow add up to an allegation of intent to interfere with his familial relationships.   This argument is foreclosed by clear Tenth Circuit precedent. *Bryson*, 905 F.2d at 1394 (holding that complaint failed to state *Bivens* claim where there were

no allegations "that any claimed acts or omissions, however intentional, occurred with the specific intent on the part of the defendants to deprive the plaintiffs of their rights of association with the victims," and that allegations that the defendants knew or should have known that their actions would result in the deprivation of familial association did not "meet the *Trujillo* requirement").

Absent allegations of intent on the part of the Individual Defendants to deprive Plaintiff of his right to familial association, the First Amended Complaint fails to allege facts sufficient to show that the Individual Defendants plausibly violated Plaintiff's constitutional rights.   Plaintiff thus has failed to meet his burden under the first prong of the qualified immunity analysis. Accordingly, the Individual Defendants are entitled to qualified immunity on Plaintiff's familial association claims, and those claims must be dismissed.

IV.   Plaintiff's Civil Conspiracy Claims

In addition to the claims of constitutional violations discussed above, in Count XVIII, Plaintiff brings a claim of civil conspiracy against all of the Individual Defendants, alleging that they conspired to commit those constitutional violations.   Specifically, Plaintiff alleges that the Individual Defendants, "as agents, servants, joint venturers, partners, employees, employers, or representatives of each other," established and committed civil conspiracy to violate Plaintiff's First and Fifth Amendment rights.   Doc. 23 ¶¶ 521, 523.   Essentially, Plaintiff alleges that, not only did the Individual Defendants violate his Fifth Amendment rights to be free from outrageous government conduct and his First Amendment/Fifth Amendment rights to familial relationships, but also they agreed, "expressly or tacitly," to violate those rights.   *Id.* ¶ 523.

In order to state a claim of civil conspiracy, a plaintiff must state facts sufficient to demonstrate both "an actual deprivation of a right secured by the Constitution and laws," and an

agreement between the parties to commit that deprivation.   *Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1449 (10th Cir. 1990) (citation omitted).   "[A] plaintiff must allege *specific facts* showing an agreement and concerted action amongst the defendants because conclusory allegations of conspiracy are insufficient to state a valid [*Bivens*] claim."   *Brooks v. Gaenzle*, 614 F.3d 1213 (10th Cir. 2010) (citation omitted) (emphasis added).

As an initial matter, Plaintiff's conspiracy claim is not supported by any "specific facts" showing an agreement or concerted action amongst the Individual Defendants.   In support of his conspiracy claim, Plaintiff summarily alleges that the Individual Defendants served as "agents, servants, joint venturers, partners, employees, employers, or representatives of each other," and agreed "expressly or tacitly" to violate Plaintiff's rights.   These allegations, however, are no more than "bare assertions" that "amount to nothing more than a formulaic recitation" of one of the elements of a conspiracy claim.   *Iqbal*, 556 U.S. at 681.   Plaintiff's allegations thus are insufficient to establish the necessary element of an agreement among the Individual Defendants.

Further, as discussed above, Plaintiff has not plausibly pleaded an actual deprivation of his Fifth Amendment rights in connection with his stacking of charges claim, or his First Amendment and/or Fifth Amendment right to familial association.   To the extent that his conspiracy claims relate to those alleged deprivations, on this additional basis, Plaintiff's allegations are insufficient to establish the necessary element of an actual deprivation of his constitutional rights.

Finally, as discussed above, the Court has determined that the Individual Defendants are entitled to qualified immunity on all three constitutional claims underlying Plaintiff's conspiracy claim.   In *Pfannstiel v. City of Marion*, the Fifth Circuit explained that "[t]he defense of

qualified immunity exists to protect an officer whose law enforcement actions were objectively reasonable.   The protection granted extends to freedom from the expense of extensive fact development or trial as well as from a personal judgment for damages."   918 F.2d 1178, 1187 (5th Cir. 1990), *overturned on other grounds by Hare v. City of Corinth,* 74 F.3d 663 (5th Cir. 1996).   Where, as here, a plaintiff alleges both constitutional violations and a conspiracy to commit those violations, if the court is required to "consider whether a conspiracy might have been formed, the officer will face fact development or trial even where the official action was objectively reasonable."   *Id.*   This consequence "carries the potential for destroying the efficacy of the [qualified immunity] defense."   *Id.*   In order to avoid this consequence, the Fifth Circuit determined that it would "look to whether the officer's actions were taken pursuant to a conspiracy" only if it first determined that the state action at issue was "not objectively reasonable."   *Id.*   Following this procedure, the Court explained, "insures that the defense of qualified immunity is given full meaning, and that the right of plaintiff to be compensated for damage caused by any official action which a reasonable official would not have taken is preserved."   *Id.*

The reasoning of *Pfannstiel* is persuasive.   Even if the First Amended Complaint properly pleaded a conspiracy among the Individual Defendants, the conduct alleged to have resulted "from that conspiracy[,] which is asserted to have caused harm to [Plaintiff][,] was objectively reasonable and therefore qualifiedly immune."   *Id.* at 1188.   For this reason, the Court "need not reach the issue of whether a conspiracy existed to engage in such actions."   *Id.*   Because the Individual Defendants are entitled to dismissal on the basis of qualified immunity of the underlying constitutional claims, so too are the Individual Defendants entitled to dismissal of Plaintiff's conspiracy claim.

**CONCLUSION**

First, Plaintiff has failed to articulate clearly established law that would have put the Individual Defendants on notice that their conduct in offering and providing to Plaintiff drugs in exchange for brokering drug transactions violated his Fifth Amendment rights.   Next, Plaintiff has failed to plausibly state a claim that the Individual Defendants violated his Fifth Amendment rights by relying on a known addiction to carry out multiple transactions with the primary purpose of stacking charges, and has failed to articulate clearly established law that would have put the Individual Defendants on notice that their conduct in using Plaintiff as a broker in multiple transactions violated his Fifth Amendment rights.   Further, Plaintiff has failed to plausibly state a claim that the Individual Defendants violated his constitutional right to familial relationships.   Finally, Plaintiff has failed to plausibly state a claim that the Individual Defendants committed civil conspiracy to violate his constitutional rights.   For these reasons, dismissal of all of the claims set forth in the First Amended Complaint against the Individual Defendants is warranted.

**IT IS THEREFORE ORDERED** that Defendants Castleberry and Whelan's Motion to Dismiss [Doc. 47], Defendant Matthew B. Mayfield's Rule 12(b)(6) Motion to Dismiss [Doc. 49], and Motion to Dismiss Claims Against Defendants Arabit and Brown on Qualified Immunity Grounds [Doc. 80] are GRANTED, as follows:   Counts III through XVIII of the First Amended Complaint are dismissed.

**IT IS THEREFORE FURTHER ORDERED** that Defendants Arabit and Brown's Rule 12(b)(1) Motion to Dismiss Substantive Due Process Claims Under Bivens [Doc. 100] is DENIED as moot.

DATED this 30th day of September, 2015.

_____

MARTHA VAZQUEZ
United States District Judge