## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

AARON ROMERO,

        Plaintiff,

v.                                         CV 14-640 MV/WPL

UNITED STATES OF AMERICA,
JOHN R. CASTLEBERRY, Special Agent –
Drug Enforcement Administration, in his individual capacity,
PATRICIA G. WHELAN a.k.a. PATRICIA YAZZIE a.k.a. TRISH YAZZIE,
Special Agent – Drug Enforcement Administration, in her individual capacity,
MATTHEW B. MAYFIELD, Group Supervisor (GS) –
Drug Enforcement Administration, in his individual capacity,
RAYMOND "KEITH" BROWN, Assistant Special Agent in Charge (ASAC) –
Drug Enforcement Administration, in his individual capacity, and
JOSEPH M. ARABIT, Special Agent in Charge (SAC) –
Drug Enforcement Administration, in his individual capacity,

        Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on United States' Motion to Dismiss for Failure to

State a Claim and Memorandum in Support [Doc. 48].   The Court, having considered the motion,

briefs, and relevant law, and being otherwise fully informed, finds that the motion is well-taken

and will be granted.

## BACKGROUND

The facts as alleged by Plaintiff in his First Amended Complaint [Doc. 23] are as follows.

Plaintiff, Aaron Romero, is a lifelong resident of Las Vegas, New Mexico.   After experimenting

with alcohol and marijuana since his early high school years, Plaintiff started using crack cocaine

the night before his high school graduation in May of 1994; for the next 17 years, his addiction to

crack dominated his life.   Doc. 23 (Compl.) ¶¶ 37, ¶ 39.   As a result of his daily drug use, in 1998,

his girlfriend left him, taking their two children with her.   Id. ¶¶ 44-45.   Although Plaintiff attended an inpatient drug treatment program in 1999, within one week of his discharge from treatment, he resumed his daily use of crack.   Id. ¶¶ 48-49.

In 2007, Plaintiff moved in with his girlfriend, Theresa Saiz, a recovering crack addict. Id. ¶¶ 51-52.   The two remained "clean" for a "long period of time" between 2007 and 2008, but resumed their daily use of crack at some point in 2008.   Id. ¶¶ 52-53.   As a result, Plaintiff lost his job at his family business, and was thereafter unable to maintain regular employment.   Id. ¶¶ 54-55.

In order to support his drug addiction, Plaintiff did, inter alia, "side jobs" for known drug traffickers, in exchange for payment in the form of crack or cash; if he received cash, he would immediately use it to purchase crack.   Id. ¶ 57.   In 2010, through a local drug trafficker, Plaintiff met Cesario, who was a customer of the trafficker.   Id. ¶ 58.   Toward the end of 2010, that trafficker left two grams of crack at Plaintiff's residence, and instructed Plaintiff not to use it.   Id. ¶¶ 63-64.   Plaintiff, however, used the crack.   Id. ¶ 65.   After the incident and because of Plaintiff's "severe addiction" to crack, the trafficker refused to provide or sell crack to Defendant. Id. ¶ 70.

"[I]n an effort to establish a reliable process to obtain crack for his own use," Plaintiff suggested that Cesario stop purchasing crack from that drug trafficker, and instead purchase crack through Plaintiff from other local drug traffickers; as payment for Plaintiff's brokering of the drug transactions, Plaintiff suggested that Cesario provide him with a small amount of crack.   Id. ¶¶ 71-72.   Cesario, "in reaction," agreed to Plaintiff's suggestion, and sometime in 2010 or 2011, began to use Plaintiff two or three times a week as a broker to purchase crack.   Id. ¶ 73.   As payment for his brokering of the drug transactions, Cesario gave Plaintiff a "one or two day

2

supply" of crack for his personal use.   Id. ¶ 74.   This "brokerage and consumption relationship"
continued for six or seven months, until "mid-summer 2011."   Id. ¶ 75.

    In mid-summer 2011, Cesario disappeared.   Id. ¶ 77.   Despite "frantically" attempting for
several days to obtain crack, without Cesario, none of the local drug traffickers or users were
willing to supply Plaintiff with crack.   Id. ¶¶ 78-80.   As a result of his inability to obtain crack,
from mid-summer 2011 to mid-November 2011, Plaintiff did not use crack.   Id. ¶ 84.

    "As the fog of addiction gradually receded over a period of several weeks during the
summer of 2011," Plaintiff "began to focus slowly on the hope and belief of recovery" from his
addiction, and "began to attempt to rehabilitate gradually his relationships with his parents,
siblings, and children."   Id. ¶¶ 82-83.   He was "able to refrain from continued, desperate attempts
to procure crack," and by mid-October 2011, "believed in his self-rehabilitation through the forced
cessation of consumption of crack" and his "renewed effort to repair his mental and physical health
– enhanced by the inspiration of reconciliation of his personal relationships."   Id. ¶¶ 84-85.

    Mending his family ties "was a more difficult undertaking than [he] had imagined."   Id. ¶
87.   By mid-November 2011, "the high degree of distrust exhibited by [Plaintiff's] family
members (regarding the potential relapse of addiction to [crack]) receded slightly, and the
persistent craving for [crack] moderated to a tolerable level."   Id. ¶ 88.   Plaintiff "was struggling
to meet the demands of everyday life, together with the grueling but increasingly successful effort
to heal the relationship with his children and other family members."   Id. ¶ 90.

    In October 2011, Cesario reappeared in Las Vegas.   Unbeknownst to Plaintiff, the DEA
had brought Cesario back to Las Vegas to work as a confidential informant in connection with
"Operation Smack City," an Organized Crime Drug Enforcement Task Force ("OCDETF") and
High Intensity Drug Trafficking Area ("HIDTA") investigation of drug traffickers in Las Vegas,

New Mexico.   Id. ¶¶ 90-92.   Defendants Castleberry and Whelan were the primary case agents

on the investigation.   Id. ¶ 99.   Defendant Mayfield supervised Castleberry and Whelan,

Defendant Brown supervised Mayfield, and Defendant Arabit supervised Brown.   Id. ¶¶ 105-118.

Upon his return to Las Vegas, Cesario, in his role as a DEA confidential informant,

contacted Plaintiff, and asked Plaintiff to "restart" the crack "brokerage and consumption

relationship," noting that he would "start coming in for bigger amounts because he had sold a

trailer." Id. ¶ 125.   Initially, Plaintiff rejected Cesario's invitation, and told Cesario that he "was

clean and intended to remain clean."   Id. ¶ 126.   At the direction of Defendants, Cesario

continued to engage Plaintiff numerous times over the next few days and weeks to restart the crack

brokerage and consumption relationship.   Id. ¶ 127.

During the week of Thanksgiving, 2011, Cesario again approached Plaintiff with a

"seductive and alluring offer": "if you score [crack] for me, I will hook you up sick", meaning that

if Plaintiff purchased crack for him, Cesario would pay Plaintiff "a large amount" of crack as a

broker fee.   Id. ¶ 128.   "As a result of the seductive allure of the offer of a large amount of Crack

Cocaine (generated and fueled by nearly two decades of addiction to Crack Cocaine . . .),

compounded by the stress to meet the demands of everyday life and the arduous effort to heal the

relationship with his children and other family members," Plaintiff agreed to "act as a broker to

obtain Crack Cocaine in return for payment of a large amount" of crack for his personal use.   Id. ¶

129.

Accordingly, on November 30, 2011, Plaintiff brokered a transaction in which he

purchased one quarter of an ounce of crack for Cesario and another confidential informant, Jason.

With Defendants' knowledge and approval, Cesario and Jason provided Plaintiff with a "large

portion" of the crack.   Id. ¶ 130.   Plaintiff used the crack over a period of two days, resulting in the "resurrection" of his "crippling" crack addiction.   Id. ¶ 132.

A few days later, Cesario contacted Plaintiff to arrange for the purchase of $40 to $50 worth of crack, in exchange for payment to Plaintiff in the form of crack for his personal use.   Id. ¶ 134.   Thereafter, "this pattern of arrangement of the acquisition of $40-$50 worth of Crack Cocaine to 1/3 ounce of Crack Cocaine for Cesario in exchange for payment of Crack Cocaine to [Plaintiff] for consumption continued 2-3 times per week from early December 2011 through May 2012."   Id. ¶ 148.   Additionally, on two occasions in December and January 2012, Jason used Plaintiff "to arrange for the acquisition of ¼ ounce of Crack Cocaine in exchange for payment of Crack Cocaine to [Plaintiff] for consumption."   Id. ¶ 150.

Once his addiction was reignited, Plaintiff's "life devolved again into a situation in which [he] was penniless and unable to escape from his addiction [or] to seek employment."   Id. ¶ 151. Further, Plaintiff "once more suffered the loss of his relationships" with his family.   Id. ¶ 230.

On August 7, 2012, a federal grand jury returned an Indictment charging Plaintiff with seven counts of distribution of a mixture and substance containing a detectable amount of cocaine base within 1,000 feet of New Mexico Highlands University, in violation of 21 U.S.C. § 860(a), and one count of opening, leasing, renting, using, or maintaining a residence for the purpose of distributing and using controlled substances, in violation of 21 U.S.C. § 856(a)(1).   Doc. 23-2 (Indictment).   The distribution charges stemmed from drug transactions that Plaintiff had brokered for confidential informants Cesario and Jason on November 30, 2011, December 8, 2011, December 29, 2011, January 6, 2012, and January 12, 2012.   Id.   Ultimately, the government moved to dismiss the Indictment as to Plaintiff, and on January 16, 2013, the Court entered an order dismissing the Indictment as to Plaintiff.   Doc. 23-3.

Based on this series of events, Plaintiff claims that Defendants improperly restarted Plaintiff's crack addiction and used his addiction to further their investigative goal of targeting drug trafficking suspects, and to stack drug related charges against Plaintiff.   Doc. 23 ¶¶ 93, 98, 100.   As a result of these alleged improprieties, on July 14, 2014, Plaintiff commenced the instant action.   In his First Amended Complaint, Plaintiff sets forth claims against Defendant United States, under the Federal Tort Claims Act, for negligence and intentional infliction of emotional distress (Counts I and II), and claims against each of the individual Defendants (Castleberry, Whelan, Mayfield, Brown, and Arabit) (the "Individual Defendants"), under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), for violation of Plaintiff's Fifth Amendment substantive due process rights to be free from bodily harm and to be free from deprivation of liberty without due process of law, violation of his First Amendment right to a continuing relationship with his family, and civil conspiracy to commit constitutional violations against him (Counts III through XVIII).

On January 9, 2015, Defendant United States filed its motion to dismiss Counts I and II of the First Amended Complaint.   In its motion, the government argues that: both of Plaintiff's claims against the government are barred by the "wrongful conduct doctrine;" Plaintiff fails to state a claim of negligence, because he cannot establish either the element of breach of duty or the element of proximate cause; and Plaintiff fails to state a claim of intentional infliction of emotional distress, because he cannot show that the conduct in question was extreme and outrageous, or that the conduct in question caused his mental distress.   Plaintiff opposes the government's motion to dismiss.

## LEGAL STANDARD

Under Rule 12(b)(6), a Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint."   *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).   When considering a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.   *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1142 (2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"   *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

The Court in *Iqbal* identified "two working principles" in the context of a motion to dismiss.   *Id.*   First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.*   Accordingly, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79.   "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."   *Id.* at 679; *see Twombly*, 550 U.S. at 570 (holding that a plaintiff must "nudge" her

claims "across the line from conceivable to plausible").   Accordingly, "where the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

has alleged – but it has not shown – that the pleader is entitled to relief."   *Id.* (citation omitted).

In keeping with these two principles, the Court explained,

a court considering a motion to dismiss can choose to begin by identifying
pleadings that, because they are no more than conclusions, are not entitled to the
assumption of truth.   When there are well-pleaded factual allegations, a court
should assume their veracity and then determine whether they plausibly give rise to
an entitlement to relief."

*Id.* at 679.

## DISCUSSION

In the First Amended Complaint, Plaintiff claims that the government negligently breached

its duty of care and intentionally inflicted upon Plaintiff emotional distress, by causing the

deliberate relapse of Plaintiff's addiction to crack and by distributing crack to Plaintiff for

consumption.   The government argues that Plaintiff's negligence and intentional infliction of

emotional distress claims both must be dismissed, because: (1) the wrongful conduct rule bars both

of Plaintiff's tort claims; (2) Plaintiff is unable to establish two of the elements of his negligence

claim, namely, duty and causation; and (3) Plaintiff is unable to establish two of the elements of his

intentional infliction of emotional distress claim, namely extreme and outrageous conduct and

causation.   As set forth herein, the Court agrees that Plaintiff's tort claims are barred by his own

illegal conduct.   Accordingly, the Court need not reach the remainder of the government's

arguments.

I.       The Wrongful Conduct Rule

A.       Standard

New Mexico has long recognized the existence of the wrongful conduct rule, which bars a

plaintiff's claim if that claim is based at least in part on the plaintiff's own illegal conduct.   As the

New Mexico Supreme Court explained:

> It is a well settled rule of law that a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party, or where he must base his cause of action, in whole or in part, on a violation by himself of the criminal or penal laws.

*Desmet v. Sublett*, 225 P.2d 141, 142 (N.M. 1950).   "The principle of this public policy is this:

No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act."

*Id.*   Notably, the wrongful conduct rule forecloses recovery by the plaintiff even where "the

defendant has participated equally in the illegal activity."   *Orzel v. Scott Drug Co.*, 537 N.W.2d

208, 212-13 (Mich. 1995).

The contours of the wrongful conduct rule require that "the plaintiff's conduct must be

prohibited or almost entirely prohibited under a penal or criminal statute," and that "a sufficient

causal nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted

damage."   *Id.* at 214-17.   Further, "the defendant's culpability [must not be] greater than the

plaintiff's culpability for the injuries"; if "the plaintiff has acted under circumstances of

oppression, imposition, hardship, undue influence, or great inequality of condition or age," the

wrongful conduct rule will not bar the plaintiff's recovery.   *Id.* at 217 (citation omitted).

B.       The Instant Case

As set forth herein, Plaintiff's own allegations demonstrate that his conduct was prohibited

by federal criminal statute and was causally related to his alleged injuries, and that his conduct

contributed to his injuries in at least the same degree as did the government's conduct.

9

In the First Amended Complaint, Plaintiff states that:   he agreed to act as a broker to obtain crack for the government's confidential informant in return for payment in the form of crack for Plaintiff's personal use; after making that agreement, on November 30, 2011, Plaintiff brokered a transaction in which he purchased crack for the confidential informants, in exchange for payment of a "large portion" of the crack; and thereafter, from early December through May 2012, this "pattern of arrangement," whereby Plaintiff purchased crack for the confidential informants in exchange for payment of crack for his personal use, continued two to three times a week.   The drug distribution charges against Plaintiff, as set forth in the August 7, 2012 Indictment attached to the First Amended Complaint, stemmed from six drug transactions that Plaintiff brokered for the government's confidential informants between November 2011 and January 2012.   Accordingly, by his own admissions, Plaintiff engaged in illegal drug distribution activities in violation of federal criminal statutes.

Plaintiff's allegations similarly make clear that his engagement in illegal drug distribution activities was a proximate cause of his injuries.   Under New Mexico law, "[a]n act or omission may be deemed a 'proximate cause' of an injury if it contributes to bringing about the injury, if the injury would not have occurred without it, and if it is reasonably connected as a significant link to the injury."   *Talbott v. Roswell Hospital Corp.*, 118 P.3d 194, 201 (N.M. Ct. App. 2005). Plaintiff admits that he received crack in exchange for brokering drug transactions for the government's informants, and that he personally used the crack that he received.   Indeed, Plaintiff specifically states that his use of the crack that he obtained from the informants on November 30, 2011, resulted in the resurrection of his crippling crack addiction.   In turn, he alleges that the resurrection of his crack addiction resulted in the injuries he suffered, namely pennilessness, the loss of his familial relationships, and his inability to escape from his addiction or seek

employment.   Accordingly, based on his own admissions, Plaintiff's brokering of drug transactions contributed to bringing about his injuries, his injuries would not have occurred without his brokering of drug transactions, and his brokering of drug transactions is reasonably connected as a significant link to his injuries.

It also is undisputed that both Plaintiff and the government, through its confidential informants, participated in the illegal drug distribution activities.   The government, through its informants and agents, undoubtedly played a pivotal role in making the drug distribution activities possible.   Specifically, it was the government's informants who approached Plaintiff and asked him to restart their crack brokerage and consumption relationship, and who, with the government's knowledge, paid Plaintiff for his drug brokering services with crack for his personal use. Nonetheless, Plaintiff's role was equally pivotal:   he agreed to the informants' offers that he broker drug deals in exchange for crack, and proceeded to broker drug deals in exchange for crack two to three times a week for approximately six months.

Moreover, nothing in the First Amended Complaint establishes that Plaintiff acted under circumstances that would suggest that the government's culpability was greater than Plaintiff's culpability.   Although Plaintiff alleges that he initially rejected the informant's invitation to restart their crack brokerage and consumption relationship and that the informant reiterated his request numerous times over the next few days and weeks, there is nothing in the First Amended Complaint to demonstrate that the government, through its informants or otherwise, unduly influenced Plaintiff or used its position of power to coerce Plaintiff.   While Plaintiff characterizes the informant's offer as "seductive and alluring," he provides no basis to conclude that the choice to accept or reject the offer was not ultimately his.   Further, Plaintiff himself alleges that he was not incapacitated from an addiction at the time he agreed to broker drug deals for the informants,

but rather had been in "self-recovery" for a period of four to five months during which he did not

use drugs and during which "the fog of addiction" had receded.   According to Plaintiff, at the time

the informants approached him, his craving for crack had "moderated to a tolerable level."   By his

own admissions, it was only after he agreed to broker transactions for the informants and accepted

crack as payment for his services that he became re-addicted to crack.   Thus, any "inequality of

condition" that he suffered came only as a result of the conduct in which he willingly engaged.

*See Orzel*, 537 N.W.2d at 566 (rejecting argument that plaintiff's culpability was less than

defendant's culpability as a result of plaintiff's alleged disability, because plaintiff was not

disabled at time he began illegally using prescription drugs, but rather caused himself to become

addicted and insane by his continuous illegal use of prescription drugs); *see also Jacobson v.*

*Pfizer*, No. 14-14226, 2015 WL 4038489, *2 (11th Cir. July 2, 2015) (upholding dismissal of

plaintiff's tort claims against pharmaceutical company on ground that claims were barred by

Florida's wrongful conduct doctrine, despite plaintiff's arguments that he was insane when he shot

his wife and children as a result of defendant's drugs that put him into a manic and psychotic state).

The allegations in the First Amended Complaint thus make clear that Plaintiff willingly accepted

the government informants' offer to act as a broker in drug transactions, willingly performed his

role in several drug transactions for which he accepted a cut of the drugs as payment for his

services, and willingly used the drugs he received, thereby becoming re-addicted to crack.   Based

on these facts, the Court cannot conclude that one party was more at fault than the other.

     C.    <u>Plaintiff's Arguments</u>

     In his response to the government's motion, Plaintiff argues that the government

mischaracterizes his allegations for purposes of its motion, and that the wrongful conduct rule is

inapplicable to his properly-framed allegations.   According to Plaintiff, he is alleging that the

government "created, funded, controlled, and furthered the 'illegal acts'" at issue, and "exploited" and "fed" Plaintiff's drug addiction with the intention of using that addiction to further the government's own goals.   Doc. 70 at 35, 39.   Based on these allegations, Plaintiff argues: the government's conduct, rather than his own, was the proximate cause of his injuries; Plaintiff's will was overborne and he thus cannot be held accountable for his own actions; and the cases cited by the government applying the wrongful conduct rule are distinguishable.   Plaintiff's allegations, even as framed by Plaintiff in his response, provide no basis for the Court to conclude that despite his own illegal conduct, he may escape the reach of the wrongful conduct rule.

First, Plaintiff argues that absent the government's conduct, his own participation in the illegal drug distribution activities would not have occurred.   For this reason, his argument continues, the government's conduct, rather than his "coerced illegal conduct," was "the proximate and factual cause" of the harm he suffered.   Doc. 70 at 36.   Plaintiff's argument ignores the fact that, "[u]nder New Mexico law, there may be more than one proximate cause of an injury."   *Andrews v. Saylor*, 80 P.3d 482, 489 (N.M. Ct. App. 2003).   Thus, "it is not necessary to show that a party's conduct was 'the' proximate cause of the injuries – showing that the party's conduct was 'a' proximate cause of the injuries is sufficient."   *Orzel*, 537 N.W.2d at 216. Accordingly, even accepting as true Plaintiff's allegations that the government "created, funded, and controlled" the illegal acts at issue, this fact is irrelevant to the question of whether Plaintiff's conduct was a proximate cause of his injuries.   As discussed above, regardless of the government's role in bringing about the subject drug transactions, Plaintiff's role as a broker in those transactions contributed to bringing about his injuries, his injuries would not have occurred without his participation, and his participation was reasonably connected as a significant link to his injuries.   Further, while in effect alleging that the government made him an offer that he could not

13

refuse, Plaintiff's allegations fall short of establishing that the government "coerced" him into agreeing to and engaging in the subject drug transactions.   Plaintiff's conduct thus was a proximate cause of his injuries; his arguments regarding the government's role in causing his injuries provides no basis to conclude otherwise.

Next, Plaintiff argues that because his will was overborne by his addiction, he may recover against the government, regardless of his engagement in the illegal drug distribution activities.   In support of this argument, Plaintiff cites to *Johnson v. Primm*, 396 P.2d 426 (N.M. 1964).   In *Johnson*, the plaintiff claimed that the defendant had failed to exercise due care in selling the plaintiff a drug in excess of the amount that her doctor had prescribed.   When *Johnson* was decided, if a plaintiff's conduct was a proximate cause of injury, that conduct would entirely bar recovery, under the doctrine of contributory negligence.   On appeal, the New Mexico Supreme Court thus considered whether the plaintiff's increasing of her dosage, in violation of her doctor's orders, was a proximate cause of her injury, in the specific context of a motion for summary judgment based on contributory negligence.   The court first explained that if there were no question as to the plaintiff's absence of will power induced by the pills, it would have no difficulty in concluding that, by her conscious violation of instructions of the doctor, her acts of daily taking more of the drug than directed would certainly deny her a recovery.   *Id.* at 601.   The court then stated that if, however, "the plaintiff was deprived of her will power and was so addicted to the use of the medication that she could not control her conduct, there would be a real question of whether her acts thereafter could be classed as contributory negligence."   *Id.* at 602.   The court explained that, "[t]o bar recovery because of contributory negligence, the question to be answered is whether the plaintiff's conduct meets the standard that a reasonably prudent person would adopt to avoid injury to herself."   *Id.*   The court then concluded that it was for the fact finder to determine

14

whether the defendant was negligent and if so whether the plaintiff was chargeable with contributory negligence proximately causing her own injury.   *Id.*

The Court cannot agree that *Johnson* exempts Plaintiff from the wrongful conduct rule. As an initial matter, neither the wrongful conduct rule, nor the guiding public policy behind that rule (*i.e.*, that the court will not lend its aid to a plaintiff who founds his cause of action upon an illegal act) was applied, considered, or even mentioned in *Johnson*.   Rather, the court in *Johnson* addressed the issue of proximate cause in the separate context of a contributory negligence defense.   Accordingly, the relevance of *Johnson* to the instant case is questionable at best.

Moreover, the court in *Johnson* specifically wrote that if the plaintiff had misused her prescription drugs before she had become addicted and her will allegedly overborne, her conduct decidedly would have been a proximate cause of her injury.   Here, as discussed above, there is nothing in the First Amended Complaint to suggest that Plaintiff was addicted to crack at the time the government's informants approached him about brokering crack deals.   To the contrary, Plaintiff repeatedly indicates that he was in self-recovery, had been drug-free for months, and was no longer living under the fog of addiction when the government "reignited" his addiction by paying him with crack for his brokerage services.   Accordingly, Plaintiff's yet-to-be rekindled drug addiction could not have overborne his will at the time he agreed to and began participating in the subject illegal drug transactions.   Plaintiff's drug addiction thus cannot exempt him from the wrongful conduct rule.

Finally, Plaintiff argues that because the cases cited in the government's motion are distinguishable from the instant case, they provide no precedent for applying the wrongful conduct rule to bar Plaintiff's recovery.   *See Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003) (holding that plaintiffs who procured and used OxyContin illegally could not recover in

tort action against pharmaceutical company, as plaintiffs inevitably had to rely on their illegal actions to establish their claims);   *Orzel*, *supra* (holding that wrongful conduct rule precluded recovery by plaintiff, who violated the controlled substances act in obtaining, possessing, and using Desoxyn without a valid prescription, from the pharmacy that filled plaintiff's false prescriptions); *Pappas v. Clark*, 494 N.W.2d 245 (Iowa Ct. App. 1992) (holding that plaintiff's cause of action against plaintiff's doctor and pharmacist was barred by his illegal conduct in using cocaine and prescription drugs).   In his response, Plaintiff lists various factual differences between the instant case and *Foister*, *Orzel*, and *Pappas*.   Plaintiff, however, does not explain how those factual differences are legally significant; in other words, Plaintiff fails to analyze why the principles of law applied to an admittedly different set of facts are not equally applicable to the facts of the instant case.   In part, Plaintiff attempts to distinguish the government's cases on the basis that each court therein found the plaintiff's condut to be a proximate cause of the alleged harms.   As discussed above, however, this Court similarly finds that Plaintiff proximately caused his injuries.   Accordingly, the finding of proximate cause in the cases cited by the government makes those cases more analogous to, rather than distinguishable from, the instant case.   Plaintiff thus has failed to point to anything – in the cases cited by the government, or elsewhere – to establish that the wrongful conduct rule is inapplicable to the facts presented here.

## CONCLUSION

Plaintiff inevitably must rely on his illegal actions to establish his claims.   Accordingly, the wrongful conduct rule bars his recovery against the government for its alleged tortious conduct.

**IT IS THEREFORE ORDERED** that United States' Motion to Dismiss for Failure to State a Claim and Memorandum in Support [Doc. 48] is GRANTED, as follows:   Counts I and II of the First Amended Complaint are dismissed.

DATED this 30th day of September, 2015.

_____
MARTHA VÁZQUEZ
United States District Judge